UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| TRUSTGARD INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:15-cv-00258-JMS-DKL |
| | ) | |
| OLD NATIONAL WEALTH | ) | |
| MANAGEMENT, As personal representative | ) | |
| of the Estate of George Scott Samson, | ) | |
| THE ESTATE OF KELLY ANN ECKER, By | ) | |
| its personal representative, Patricia Leturgez, | ) | |
| PATRICIA ANN LETURGEZ, As co-guardian | ) | |
| of L.O.E., | ) | |
| JERRALD ANTHONY LETURGEZ, As co- | ) | |
| guardian of L.O.E., | ) | |
| L.O.E. by his natural parent and next best | ) | |
| friend, William Ecker, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

In the early morning hours of October 5, 2014, George Scott Samson shot and killed Kelly

Ann Ecker in front of her son L.O.E.  Mr. Samson then killed himself.  He and Ms. Ecker had

participated in a wedding ceremony the previous day, and the post-ceremony reception took place

at Mr. Samson's home, where the shooting occurred.  Plaintiff Trustgard Insurance Company

("Trustgard") was the homeowner's insurer for Mr. Samson.  Trustgard initiated this litigation

seeking declaratory judgment against Defendants Old National Wealth Management, as personal

representative of the Estate of George Scott Samson, (the "Estate of Mr. Samson"), the Estate of

Kelly Ann Ecker, (the "Estate of Ms. Ecker"), Patricia Leturgez and Jerrald Anthony Leturgez as

Co-Guardians of L.O.E., and L.O.E. by his natural parent and next friend, William Ecker.[1] [Filing No. 1; Filing No. 7.] Trustgard argues that the insurance policy it issued to Mr. Samson does not provide any coverage in connection with the death of Ms. Ecker or L.O.E.'s alleged injuries. [Filing No. 7 at 9.] Trustgard has filed a Motion for Summary Judgment, [Filing No. 53], and the Estate of Ms. Ecker and L.O.E., by his natural parent and next best friend, (collectively "Defendants") oppose that motion, [Filing No. 60; Filing No. 63].

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

---

[1] Although different parties have appeared and filed on behalf of L.O.E., the Court will hereinafter refer to this defendant solely as "L.O.E."

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### EVIDENTIARY OBJECTION

Before discussing the merits of the case, the Court will first address an evidentiary issue that Trustgard raises.  Trustgard argues that this Court should strike the affidavit of Brian S. Joseph, M.D., because it claims it is inadmissible.  [Filing No. 75 at 4.]

Dr. Joseph is a psychiatrist who was retained by the Estate of Ms. Ecker and L.O.E. to provide a forensic determination of the mental state of Mr. Samson "during the time leading up to and including his death . . . ."  [Filing No. 60-2 at 1-2.]  Dr. Joseph concluded that "in [his] opinion to a reasonable medical certainty, [Mr.] Samson was suffering from an *Adjustment Disorder with a Disturbance of Conduct* . . . ."  when he shot Ms. Ecker.  [Filing No. 62-7 at 7-8 (original emphasis).]  In evaluating Mr. Samson's behavior, Dr. Joseph stated in relevant part the following:

> 7.1. [Mr.] Samson was increasingly possessive over [Ms. Ecker] through their relationship and was a very controlling individual who could not understand any kind of resistance and saw all hesitancy as defiance.

> 7.2. Following the last of their wedding guests to leave the residence – except [Ms. Schafer], [Mr.] Samson's parents and L.O.E. – **his new wife, [Ms. Ecker], *likely informed* [Mr.] Samson that she was not, in fact, married to him, and would not sign the marriage certificate, or in some other way notified him that she wanted to end the relationship and leave him. This would have been [Mr.] Samson's acute stressor.**

> 7.3. This information – however [Ms. Ecker] expressed it to him – enraged him to the point that he was in a crisis state of mind and could not control his emotions. [Mr.] Samson was overcome with rage and could not control his impulse to kill [Ms. Ecker].

> 7.4. At the time that he broke into the door of [L.O.E.]'s bedroom and emptied his gun into [Ms. Ecker] in front of her son, [Mr.] Samson could not control his actions; and in that moment, he had no moral compass and was temporarily insane to a reasonable degree of medical certainty. [Mr.] Samson was going to kill her; the logical or moral compass part of his brain was *not functioning*. A sane killer would have no need to empty the entire magazine into his victim. The part of his brain that told [Mr.] Samson what was right or wrong was turned off, *i.e.*, he did not have the ability to appreciate what was right or what was wrong. He was overcome with rage. In other words, [Mr.] Samson was unable at that moment to conform his behavior to societal norms.

7.5. After the act, he experienced a release of the emotions, which is evidenced by the way he walked away from the scene.

7.6. Upon the release of his emotions, his logical brain partially came back to realize that his life is "over"; and upon short reflection that he had no alternative for any kind of future contentment and peace of mind and would only face consequences for his actions. Thus, his demeanor changed, and he began to rush to commit suicide, saying "It's too late." Adjustment disorders are associated with an increased risk of suicide.

7. 7. It [is] evident from the facts that his impulse was one that could not be controlled, since [Mr.] Samson responded to this uncontrolled impulse by ending his own life. Had [Mr.] Samson been able to control his impulse to kill [Ms.] Ecker in reaction to her communication of her intent to leave him, another scenario of facts would have taken place. The whole scenario of events is a part of the maladaptive behavior, which in this case, resulted in an overwhelming sense of hopelessness leading to the final suicide of [Mr.] Samson.

[Filing No. 62-7 at 8-9 (emphasis added).]

In their respective responses, Defendants rely heavily on Dr. Joseph's findings and claim that Dr. Joseph's affidavit is admissible and establishes that there is a genuine issue concerning whether Mr. Samson was insane at the time he shot Ms. Ecker.  [Filing No. 60 at 11; Filing No. 62-7; Filing No. 63 at 9-10.]

According to Trustgard, Dr. Joseph relies in part on Ms. Schafer's testimony, which it claims is inadmissible hearsay.  [Filing No. 75 at 4.]  Trustgard discusses the applicable statutes and case law that provides what must be included in expert testimony to be admissible, and claims that here, "Dr. Joseph is attempting to conduct a psychological autopsy regarding a deceased person," and that "he is improperly attempting to provide a conclusion about [Mr.] Samson's mental state at the time [Mr.] Samson shot Ms. Ecker, despite having never examined [Mr.] Samson."  [Filing No. 75 at 7-9.]  It further argues that even if it were to accept Ms. Schafer's testimony as true, "there is no evidence whatsoever that Ms. Ecker actually told [Mr.] Samson she would not sign the marriage certificate and that was why he 'snapped.'"  [Filing No. 75 at 9.]

Trustgard argues that given the absence of any evidence to support a critical assumption, Dr. Joseph's opinion is not the product of reliable principles and methods.  [Filing No. 75 at 11.]

In surreply, Defendants argue that whether Ms. Schafer's statements lack credibility "is an issue for the finder of fact . . . ."  [Filing No. 76 at 4.]  Moreover, Defendants argue that Dr. Joseph's opinion relies on first-hand observations of Ms. Schafer, George C. Samson (Mr. Samson's father) ("George"), and the law enforcement officers.  [Filing No. 76 at 4-5.]  Defendants claim that based on this "it can be reasonably inferred that [Mr.] Samson discovered [Ms. Ecker's] intent to not become legally married to him and that this discovery, or discovery of [her] intent to otherwise terminate their relationship, . . . was the acute stressor that led to [Mr.] Samson's Adjustment Disorder with a Disturbance of Conduct."  [Filing No. 76 at 5.]  Defendants contend that the cases that Trustgard cites are distinguishable, and that Dr. Joseph's psychological analysis determined that Mr. Samson suffered from a mental disorder that prevented him from conforming to societal norms.  [Filing No. 76 at 6-7.]

Trustgard bears the burden of proving that an insurance coverage exclusion applies, but it is settled law that a person is presumed sane until proven otherwise.  *W. Am. Ins. Co. of the Ohio Cas. Grp. of Ins. Companies v. McGhee*, 530 N.E.2d 110, 112 (Ind. Ct. App. 1988).[2]  Here, the Defendants have the burden of proving Mr. Samson's insanity by a preponderance of the evidence.  *Id.*  "Proof of legal insanity . . . requires some evidence tending to prove that the actor was unable to conform his behavior to societal norms."  *Id.* (citation omitted).  "The insanity defense concerns the defendant's mental state at the time of the crime."  *Galloway v. State*, 938 N.E.2d 699, 714 (Ind. Ct. App. 2010).  Indiana recognizes "'temporary insanity,'" which "allows for the possibility

---

[2] As a federal court sitting in diversity, the Court applies state substantive law and federal procedural law.  *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001).

that a defendant will be legally insane at the time of the crime, but [of sound mind] immediately before and [ ] after the crime." *Id.*

The affidavit of Dr. Joseph is the exclusive evidence Defendants have proffered to prove Mr. Samson's insanity.  When a party files an affidavit to be considered at the summary judgment stage, the "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56.  "[A]lthough personal knowledge may include reasonable inferences, those inferences must be "'grounded in observation or other first-hand personal experience.  They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'"  *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (citing *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991)).

With regard to the admission of expert testimony into evidence, Dr. Joseph's affidavit may be admissible if it meets the following criteria:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In addition, the particular instant facts or data upon which an expert bases an opinion or inference must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703.

Having reviewed and considered Dr. Joseph's affidavit, the Court finds his testimony speculative and not reliable.  Here, Dr. Joseph indicates that he relied upon the autopsy reports of Mr. Samson and Ms. Ecker, some medical records, and the testimony of several witnesses, including Ms. Schafer, George, Deidra Cory Samson, and Sgt. Fitzgerald, to assist in his analysis.

[Filing No. 62-7 at 2.]  He then discusses the events as he imagines they occurred prior to the incident and shortly thereafter.

Any reliability of Dr. Joseph's affidavit evaporates, however, when he completely speculates that the "acute stressor" that enraged Mr. Samson was when Ms. Ecker *likely notified* Mr. Samson that she did not intend to marry him or intended to leave him.  This statement is utterly speculative and not supported by any evidence.  There is no testimony from any witness with personal knowledge that Ms. Ecker (or someone else) that night told Mr. Samson about Ms. Ecker's intentions, or that any such conversation was the acute stressor for Mr. Samson.  "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support."  *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (holding that the district court did not err in excluding expert testimony regarding the defendant's (a Ghanaian immigrant) susceptibility to FBI interrogation tactics, because there was no "empirical link between [the experts'] research and the opinion that [the defendant] likely gave a false confession"); *see, e.g., United States v. Bradbury*, 2015 WL 4627018 (N.D. Ind. 2015) (the district court limiting the expert's testimony at trial "to opine as to the general behavioral patterns of Facebook users," but not about the defendant's "behavioral patterns on Facebook, much less his intent behind one specific post, based on only one post").  Because the factual premise upon which Dr. Joseph's testimony is based is non-existent, the opinion on which it is based – namely that Mr. Samson suffered from Adjustment Disorder with a Disturbance of Conduct such that he could not control his actions and went temporarily insane when he shot Ms. Ecker – is inadmissible.  Accordingly, the Court strikes Dr. Joseph's affidavit because it is unreliable.

# III.
## STATEMENT OF FACTS

The following statement of facts was evaluated pursuant to the standards set forth above, that is, they are either undisputed or presented in the light most favorable to Defendants.

### A. Mr. Samson's and Ms. Ecker's Relationship

Mr. Samson and Ms. Ecker began dating in 2013. [Filing No. 60-1 at 2.] According to Ms. Ecker's friend, Cherise Schafer, Mr. Samson and Ms. Ecker dated for about a year and a half, and during that time, Mr. Samson was possessive, controlling, and aggressive toward Ms. Ecker. [Filing No. 60-1 at 4-5.] Over time, Ms. Ecker began to lose confidence in herself as a result of the abusive relationship. [Filing No. 60-1 at 5.]

Ms. Schafer testified regarding many aspects of Mr. Samson's and Ms. Ecker's relationship that she either witnessed or learned about from Ms. Ecker.[3] She stated that when Ms. Ecker and Mr. Samson would break up, he had a pattern of stalking her and repeatedly calling or texting her to demand that she come back to him. [Filing No. 60-1 at 3; Filing No. 60-1 at 11-12.] Ms. Ecker never stood up to Mr. Samson, and would instead avoid him or agree with him in order to "pacify" him. [Filing No. 60-1 at 8; Filing No. 60-1 at 19.] Ms. Schafer stated that Mr. Samson belittled Ms. Ecker by calling her names and insulting her on several occasions. [Filing No. 60-1 at 19-20.] She indicated that Mr. Samson was also controlling of Ms. Ecker's physical appearance. [Filing No. 60-1 at 18.]

Ms. Schafer stated that on one occasion, Mr. Samson demanded to come over to Ms. Ecker's home, and Ms. Ecker asked Ms. Schafer if she could also come over. [Filing No. 60-1 at

---

[3] In its reply, Trustgard raises several objections regarding Ms. Schafer's testimony indicating that much of it is "inadmissible hearsay, speculation, or opinion." [Filing No. 75 at 2-4.] Because at this stage of the litigation the Court must view the record in the light most favorable to the nonmoving party, the Court will consider Ms. Schafer's testimony. In any event, the Court ultimately rules in favor of Trustgard notwithstanding Ms. Schafer's testimony.

3.] Ms. Schafer said that Ms. Ecker told her that she did not want her to leave that night because Mr. Samson "[was] going to want to have sex with [her]" but that she did not want to. [Filing No. 60-1 at 3.] According to Ms. Schafer, Mr. Samson expected Ms. Ecker to have sex with him every time he saw her. [Filing No. 60-1 at 7.] Ms. Schafer stated that Mr. Samson felt that L.O.E., Ms. Ecker's son, was an intrusion in their relationship. [Filing No. 60-1 at 4-5.]

Ms. Schafer testified that Mr. Samson would bother Ms. Ecker at Union Hospital, her place of employment, in front of her coworkers. [Filing No. 60-1 at 13-14.] She indicated that Mr. Samson would sit at Ms. Ecker's work station, eat lunch, and prevent her from caring for her patients. [Filing No. 60-1 at 14.] She stated that Ms. Ecker told her that during the work holiday party in 2013, Mr. Samson became intoxicated, groped Ms. Ecker, and insulted her in front of her co-workers. [Filing No. 60-1 at 9-10.] Ms. Schafer further stated that after they had broken up, Mr. Samson begged her to come back to him and proposed to Ms. Ecker in front of her co-workers. [Filing No. 60-1 at 15-16.] Ms. Ecker accepted the ring. [Filing No. 60-1 at 16.]

**B. The Wedding Ceremony**

Prior to the wedding ceremony, Mr. Samson and Ms. Ecker signed an application for marriage license. [Filing No. 7-5 at 6.] Ms. Schafer testified that Ms. Ecker did not intend to go through with the marriage. [Filing No. 60-2 at 16-17.] Ms. Ecker had secretly made plans to move out of Mr. Samson's residence at a later date. [Filing No. 62-3 at 13-14.] Ms. Ecker rented a house the week before the wedding, and a man that she previously dated rented a U-Haul for her. [Filing No. 60-2 at 16-17.]

On October 4, 2014, the date of the wedding ceremony, Ms. Schafer said that Ms. Ecker confessed to her that "she was marrying him that day because she was afraid not to" and that she was scared about what could happen if she did not marry him. [Filing No. 60-1 at 5-6.] Ms. Ecker

had Ms. Schafer hold on to the marriage certificate after the ceremony because Ms. Ecker did not want Mr. Samson to see it.  [Filing No. 60-1 at 22.]  Ms. Schafer later gave it back to Ms. Ecker. [Filing No. 60-1 at 22.]  Ms. Ecker did not let Mr. Samson know about her intent not to sign the marriage certificate.  [Filing No. 60-1 at 22.]

Mr. Samson and Ms. Ecker hosted the post-ceremony reception at Mr. Samson's residence in Terre Haute, Indiana.  [Filing No. 60-1 at 24.]  Ms. Schafer was Ms. Ecker's only friend to attend the reception.  [Filing No. 60-1 at 24.]  She claimed that Mr. Samson appeared to be angry with Ms. Ecker and did not speak to her.  [Filing No. 60-1 at 24-27.]  Ms. Schafer remained at the residence that night, and in the early morning of October 5, 2014, she said she woke up to find Mr. Samson leaning over her and screaming and cursing at her to get out of the house.  [Filing No. 60-1 at 29.]  She further stated that Mr. Samson looked "terrifyingly angry," that "his posture was very threatening," and that he looked "like he could attack [her] at any second because he was so angry that [she] was at his house."  [Filing No. 60-1 at 29.]

Ms. Schafer claims that Ms. Ecker looked "terrified" and "scared to death."  [Filing No. 60-1 at 31.]  Ms. Schafer claimed that she asked Ms. Ecker at least twice to come with her, but that Ms. Ecker shook her head no.  [Filing No. 60-1 at 32.]  She noted that Mr. Samson was more enraged that morning than he had been the night before.  [Filing No. 60-1 at 33.]

### C.  The Shooting

Mr. Samson's father, George, also observed Mr. Samson's behavior the morning of October 5, 2014.  [Filing No. 60-3 at 2.]  George and his wife (Mr. Samson's mother) were in the bedroom next to L.O.E.'s bedroom.  [Filing No. 60-3 at 2; Filing No. 60-3 at 4.]  George said that he heard Mr. Samson and Ms. Ecker arguing.  He stated that Ms. Ecker went into L.O.E.'s room and made a phone call saying, "Hurry, he is trying to shoot me."  [Filing No. 60-3 at 7.]  George

then observed Mr. Samson break down L.O.E.'s door. [Filing No. 60-3 at 8.] George claimed that in his opinion, Mr. Samson seemed to be "out of his mind." [Filing No. 60-3 at 9.] He heard Mr. Samson discharge seven gunshots in the room and then saw Mr. Samson slowly walk out of the room and down the hall with the gun in his hand. [Filing No. 60-3 at 13.] Mr. Samson went to the basement where he shot and killed himself. [Filing No. 60-4 at 3-4.]

Sergeant Kristopher Fitzgerald testified that he collected the casings of nine bullets from a .40 caliber Glock handgun in the room where Mr. Samson shot Ms. Ecker. [Filing No. 53-4 at 2-3; Filing No. 60-4 at 2; Filing No. 60-4 at 5.] Mr. Samson used the Glock to kill Ms. Ecker, which has a nine-cartridge capacity magazine, and the Glock was empty. [Filing No. 53-4 at 7.] Ms. Ecker was hit by three bullets. [Filing No. 53-5 at 2.] Mr. Samson used a .45 semiautomatic handgun to kill himself. [Filing No. 60-4 at 3-5; Filing No. 60-4 at 7-8.] Per Sgt. Fitzgerald's experience, when he investigates an accidental shooting, it usually involves one bullet being fired. [Filing No. 53-4 at 7.]

The marriage license expired without any marriage certificate ever having been filed with the Vigo County Clerk. [Filing No. 62-6 at 1-2.]

**D.  State Court Claims**

On March 11, 2015, the Estate of Ms. Ecker and L.O.E. filed a Complaint in Vigo Superior Court against the Estate of Mr. Samson for the death of Ms. Ecker. [Filing No. 7-2.] Ms. Ecker and L.O.E. filed an Amended Complaint on April 17, 2015, where they alleged that Ms. Ecker died as a result of gunshot wounds from "the intentional act and or negligence of George Scott Samson . . . ." [Filing No. 7-4 at 1.] L.O.E. alleged that "as a result of the defendant's intentional act and/or negligence, . . . [L.O.E.] has suffered the loss of love, companionship and support, [has]

incurred costs associated with funeral and burial, and costs associated with the administration of

the estate, including reasonable attorneys' fees . . . ." [Filing No. 7-4 at 3.][4]

On June 9, 2015, L.O.E. filed an Amended Complaint for Damages, which alleged that Mr.

Samson intentionally shot and killed Ms. Ecker in front of L.O.E., and that he negligently,

intentionally, or recklessly caused L.O.E. to suffer emotional distress.  [Filing No. 7-5 at 1-3.]

### E.  Mr. Samson's Insurance Policy

Mr. Samson purchased a homeowner insurance policy (number TH1472837-00) from

Grange Insurance/Trustgard.  [Filing No. 7-1 at 1.]  Trustgard claims that there are certain

provisions of the policy that preclude coverage for claims brought by the Estate of Ms. Ecker and

L.O.E. against the Estate of Mr. Samson.

The pertinent definitions of the policy are as follows:

1.  "You" and "your" refer to the Named Insured, which includes the individual
    named on the Declarations Page or that person's spouse if a resident of the same
    household.
2.  "We", "us" and "our" refer to Trustgard Insurance Company.
3.  "Bodily injury" means bodily harm, sickness or disease, including required
    care, loss of services, and resulting death.

* * *

6.  "Insured person" means:
    a.  you;
    b.  your relatives residing in your household; and
    c.  any other person under the age of 21 residing in your household who is in
        your care or the care of a resident relative.

* * *

---

[4] The Amended Complaint also sought punitive damages.  [Filing No. 7-4 at 3-4.]  In the current
litigation, Trustgard argues that punitive damages are not insurable under Indiana law, [Filing No.
54 at 17], but the Estate of Ms. Ecker and L.O.E. did not address this argument in their respective
responses.  Thus, the Court finds that Trustgard is entitled to summary judgment and a declaration
that it is not obligated to cover any claim for punitive damages against Mr. Samson's estate.

9.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury or property damage during the policy period.

* * *

13. "Resident" means a person related to you by blood, marriage or adoption, includes wards and foster children, and whose principal residence is at the location shown on the Declarations Page. If a court has adjudicated that one parent is the custodial parent, that adjudication shall be conclusive with respect to the minor child's principal residence.

[Filing No. 7-1 at 36-37 (emphasis omitted).]  Under Coverage E – Personal Liability Protection,

("Coverage E"), the policy states that it will cover as follows:

We will pay all sums, up to our limit of liability shown on the Declarations Page for this coverage, arising out of any one loss for which an insured person becomes legally obligated to pay as damages because of bodily injury or property damage, caused by an occurrence covered by this policy. Damages include prejudgment interest awarded against the insured person.

If a claim is made or suit is brought against the insured person for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will defend the insured person at our expense, using lawyers of our choice. We are not obligated to pay any claim or judgment or to defend after we have paid an amount equal to the limit of our liability shown on the Declarations Page for this coverage. We may investigate or settle any claim or suit as we think appropriate.

[Filing No. 7-1 at 54 (emphasis omitted).]  Under Coverage F – Medical Payments to Others,

("Coverage F"), the policy states that it will cover as follows:

A. We will pay the reasonable expenses incurred, up to our limit of liability shown on the Declarations Page for this coverage, for necessary medical, surgical, x-ray and dental services, prosthetic devices, eyeglasses, hearing aids, pharmaceuticals, ambulance, hospital, licensed nursing and funeral services. These expenses must be incurred within three years from the date of an accident causing bodily injury covered by this policy.

Each person who sustains bodily injury is entitled to this protection when that person is:

1. on an insured premises with the permission of an insured person; or
2. elsewhere, if the bodily injury:
   a.  arises out of a condition in the insured premises or the adjoining ways;

14

      b.  is caused by the activities of an insured person or residence employee· in the course of employment by an insured person;

      c.  is caused by an animal owned by or in the care of an insured person; or

      d.  is sustained by a residence employee arising out of and in the course of employment by an insured person.

  B. We do not cover injury to:

  1.  insured persons; or

  2.  any other person, except a residence employee, who resides regularly on any part of an insured premises.

[Filing No. 7-1 at 54 (emphasis omitted).]  There are three exclusions to Coverage E and F under the Personal Liability Protection Exclusions section at issue in this case.  [Filing No. 7-1 at 57; Filing No. 7-1 at 59.]  The first exclusion, ("Exclusion 6), states that it does not cover the following:

    6.  Bodily injury or property damage caused by the willful, malicious, or intentional act of any person, including any claims alleging negligent supervision, negligent entrustment, or negligent failure to control against any insured person arising out of the willful, malicious, or intentional act.

[Filing No. 7-1 at 57 (emphasis omitted).]   The second exclusion, ("Exclusion 8"), excludes coverage of the following:

    8.  Bodily injury or property damage expected or intended by any insured person. This includes bodily injury or property damage:

      a.  caused intentionally by or at the direction of an insured person; or

      b.  which results from any occurrence caused by an intentional act of any insured person where the results are reasonably foreseeable.

[Filing No. 7-1 at 57 (emphasis omitted).]   The third exclusion, ("Exclusion 18"), excludes coverage of the following:

    18. Bodily injury or property damage arising from a criminal act or omission which is committed by, or at the direction of an insured person. This exclusion applies regardless of whether the insured person is actually charged with, or convicted of a crime.

[Filing No. 7-1 at 59 (emphasis omitted).]  There is one exclusion to Coverage E under the Personal Liability Protection Exclusions section at issue in this case, ("Resident Relative Exclusion"), which indicates that the policy will not cover the following:

6. Bodily injury to:
   a.   you;
   b.   your relatives residing in your household; and
   c.   any other person under the age of 21 residing in your household who is in your care or the care of a resident relative.

[Filing No. 7-1 at 59 (emphasis omitted).]   Lastly, under the "Homeowners Amendatory Endorsement – Indiana," the policy in relevant part provides the following:

> If a claim is made or suit is brought against the insured person for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will defend the insured person at our expense, using lawyers of our choice. Upon issuance of a reservation of rights letter to any party, we reserve the right to recover from any party to whom we have provided a defense any defense costs incurred by us should a court of competent jurisdiction conclude that we had no duty to provide a defense to that party. The reservation of rights letter will give notice of the coverage issues and our right to recover defense costs. Recoverable defense costs include only those attorney fees and costs associated with the defense of the party to whom the reservation of rights letter was issued. We are not obligated to pay any claim or judgment or to defend after we have paid an amount equal to the limit of our liability shown on the Declarations Page for this coverage. We may investigate or settle any claim or suit as we think appropriate.

[Filing No. 7-1 at 25 (emphasis omitted).]

## F.   The Federal Claim

Trustgard filed the underlying cause of action for declaratory judgment asking the Court to declare that there is no coverage for, no duty to defend, and no duty to indemnify the Estate of Mr. Samson in relation to the state court claims brought by the Estate of Ms. Ecker and L.O.E. against the Estate of Mr. Samson for the death of Ms. Ecker and any alleged injuries to L.O.E. [Filing No. 1 at 7-8.] Trustgard has now filed a motion for summary judgment, [Filing No. 53], and Defendants oppose that motion, [Filing No. 60; Filing No. 63]. The motion is now ripe for the Court's review.

## IV.

### DISCUSSION

Trustgard argues that the Resident Relative Exclusion and Exclusions 6, 8, and 18 of the policy exclude coverage for claims brought by the Estate of Ms. Ecker and L.O.E.  [Filing No. 54 at 11-16.]  Defendants in their respective responses claim that disputes of material fact exist regarding whether Ms. Ecker and Mr. Samson were married and whether Mr. Samson was temporarily insane during the shooting such that his conduct was neither intentional nor criminal.  [Filing No. 60 at 8-12; Filing No. 63 at 8-13.]

### A.  Insurance Policy Interpretation

When the Court exercises diversity jurisdiction over an action, it is "obliged to apply state law to the substantive issues in the case."  *Lodholtz v. York Risk Servs. Grp., Inc.,* 778 F.3d 635, 639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)).  The parties do not dispute that Indiana law governs this action.  Accordingly, this Court must "apply the law that would be applied by the Indiana Supreme Court."  *Lodholtz,* 778 F.3d at 639.  "If the Indiana Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the state's intermediate appellate courts as authoritative, unless there is a compelling reason to think that the state supreme court would decide the issue differently."  *Id.*

The Indiana Supreme Court has summarized the well-established standards for interpreting insurance policies in Indiana as follows:

> Interpretation of an insurance policy presents a question of law that is particularly suitable for summary judgment.  It is well settled that where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured.  This is especially true where the language in question purports to exclude coverage.  Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable. Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity. Where ambiguity exists not because of

17

extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the insured for purposes of summary judgment.

*State Auto. Mut. Ins. Co. v. Flexdar, Inc.,* 964 N.E.2d 845, 848 (Ind. 2012) (citations and quotations omitted).  Additionally, the Court will "construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs."  *West Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.,* 598 F.3d 918, 921 (7th Cir. 2010) (applying Indiana law). Words are given their ordinary meaning, though where ambiguity exists the policy is read "strictly against the insurer." *Id.*

### B. Policy Exclusions

#### 1. *Resident Relative Exclusion*

Trustgard argues that the Resident Relative Exclusion precludes coverage for the claims brought by Ms. Ecker and L.O.E.  [Filing No. 54 at 16.]  It claims that Mr. Samson and Ms. Ecker were married right before Mr. Samson killed Ms. Ecker and that L.O.E., who was under 21 years old at the time, lived in the residence with his mother at the time of her death.  [Filing No. 54 at 16.]

Defendants in their respective briefs argue that Ms. Ecker and Mr. Samson were not legally married because Ms. Ecker went through with the ceremony under duress, and because the marriage license and certificates were not signed by the Officiant, Ms. Ecker, and Mr. Samson. [Filing No. 60 at 8-9; Filing No. 63 at 11-13.]

In reply, Trustgard claims that "Ms. Schafer's testimony that Ms. Ecker did not willingly undergo the marriage ceremony . . . [but] did so under duress, constitutes inadmissible opinion and hearsay." [Filing No. 75 at 3.]  It further claims that her "testimony that Ms. Ecker told Ms. Schafer that Ms. Ecker was marrying [Mr.] Samson [ ] because she was afraid not to, and that Ms. Ecker was afraid of what would happen if she did not marry him to the point that she intended on going

through the ceremony and never signing the marriage license constitutes, inadmissible hearsay under FRE 804." [Filing No. 75 at 3-4.]   Moreover, Trustgard claims that "Ms. Schafer's testimony that she held onto the marriage certificate after the ceremony was over because Ms. Ecker did not want [Mr.] Samson to see it constitutes inadmissible opinion testimony." [Filing No. 75 at 4.]

Defendants filed a joint surreply where they argue that Ms. Schafer's testimony regarding Ms. Ecker's intent to go through with the ceremony because of her fear of Mr. Samson "is admissible to prove that she was in fear at the time and that [she] inten[ded] to refrain from signing the marriage certificate." [Filing No. 76 at 3.]   Defendants further state that Ms. Schafer's statements regarding the fact that she held on to the marriage certificate and her reason for doing so are based on her personal observations of Ms. Ecker.   [Filing No. 76 at 3.]   Moreover, Defendants argue that Ms. Schafer's statements are offered not for the truth of the matter asserted, but to prove that Ms. Ecker "only went through with the marriage ceremony out of fear/under duress, and never intended to become legally married." [Filing No. 76 at 3.]

Parties who intend to marry must present a license to a person authorized to solemnize marriages.   Ind. Code § 31-11-4-13.   The individual who solemnized the marriage must then complete the original and duplicate marriage certificates, give the original certificate to the individuals who married each other, and file the duplicate certificate and the license with the clerk of the circuit court no later than thirty days after the date of the marriage.   Ind. Code § 31-11-4-16.

Defendants have presented facts that call into question whether Mr. Samson and Ms. Ecker were legally married.   First, there is no record at Vigo Superior Court of the marriage license and marriage certificate ever being filed.   The only procedural mechanism under Indiana law to

19

recognize a marriage if the individual who solemnized the marriage does not file the marriage license and certificates is if either party files a declaratory judgment with the court in order to recognize their marriage.  *See* Ind. Code 31-11-4-17.  This would not be possible, given that Mr. Samson and Ms. Ecker are deceased.  Ms. Schafer also testified that Ms. Ecker never intended to go through with the marriage and that she went through with the wedding ceremony under duress.  Trustgard does not respond to Defendants' interpretation of the statutes, but merely challenges Ms. Schafer's testimony as inadmissible, and claims that Mr. Samson and Ms. Ecker were married because they went through with the wedding ceremony.  While the Court does not take the position that Mr. Samson and Ms. Ecker were not married, it is possible that a fact-finder could ultimately determine that Ms. Ecker did not marry Mr. Samson given Ms. Schafer's testimony and the fact that the marriage license and certificate were not filed.  Therefore, viewing the record in the light most favorable to Defendants, the Court finds that a material dispute exists regarding whether Mr. Samson and Ms. Ecker were married.

This dispute is significant because the Resident Relative Exclusion excludes coverage for bodily injury to the insured or the insured's relatives, which includes the spouse, and anyone under the age of 21 who resides in the household and is in the insured's care.  Since there is a dispute regarding whether Mr. Samson married Ms. Ecker, the Court cannot conclude as a matter of law that the Resident Relative Exclusion excludes coverage for bodily injury to Ms. Ecker or L.O.E., and summary judgment is denied on this issue.

### 2.  *Exclusions 6 and 8*

Trustgard argues that Exclusion 6 "excludes coverage for bodily injury or property damage caused by the willful, malicious, or intentional act of any person" and that Exclusion 8 "bars coverage for bodily injury or property damage expected or intended by any insured person."

[Filing No. 54 at 11.] Trustgard argues that the exclusions apply because this case does not involve an accidental shooting, and Mr. Samson fired the gun multiple times at Ms. Ecker with the intent to cause injury.  [Filing No. 54 at 13.]  It argues that L.O.E.'s "emotional distress derives from [Mr.] Samson's intentional shooting of Ms. Ecker" and that such a claim is also excluded.  [Filing No. 54 at 13.]

In response, the Estate of Ms. Ecker argues that Dr. Joseph diagnosed Mr. Samson with Adjustment Disorder with Disturbance of Conduct at the time of the shooting, that he was temporarily insane when he shot Ms. Ecker, and that therefore his shooting was not intentional. [Filing No. 60 at 11.]  L.O.E. in his response raises similar arguments and claims that "there is a genuine issue of material fact as to whether [Mr.] Samson was legally capable at the time he shot [Ms.] Ecker for forming the requisite mental state that would make Exclusions [6 and 8] applicable to [Mr.] Samson's actions giving rise to L.O.E.'s claims."  [Filing No. 63 at 10-11.]

In reply, Trustgard argues that it has demonstrated that Dr. Joseph's affidavit is insufficient to show that Mr. Samson was insane at the time of the shooting.  [Filing No. 75 at 12.]  It states that even if Mr. Samson jolted back to sanity after the killing, "simply because an act is committed in the heat of passion does not render it unintentional."  [Filing No. 75 at 11.]  It claims that no other evidence contradicts the conclusion that Mr. Samson intentionally shot Ms. Ecker.  [Filing No. 75 at 12.]

Exclusion 6 bars coverage to any person against the insured person arising out of an intentional act, and Exclusion 8 bars coverage for bodily injury or property damage caused intentionally by the insured person.  [Filing No. 7-1 at 57.]  Here, the only evidence that Defendants rely upon to demonstrate that Mr. Samson's shooting was not intentional is Dr. Joseph's affidavit. The Court has determined above that Dr. Joseph's opinion testimony attesting to the fact that Mr.

Samson was temporarily insane at the time of the shooting is inadmissible.  Other than the affidavit, Defendants have not set forth any other evidence that would call into question whether Mr. Samson's act was intentional.

Trustgard cites to persuasive legal authority under Indiana law that describes when a person's act is considered "intentional" under the terms of an insurance policy exclusion.  *See Allstate Insurance Co. v. Herman*, 551 N.E.2d 844, 845 (Ind. 1990) (holding that a policy that excluded coverage for intentional acts did not cover a person who was shot by the insured when the insured deliberately fired four shots into a crowd, although he did not intend to shoot the person); *Home Ins. Co. v. Neilsen*, 332 N.E.2d 240, 244 (Ind. Ct. App. 1975) (holding that a policy that excluded coverage for bodily injury caused by an intentional act excluded coverage to the individual who was intentionally struck by his neighbor's fist even though the neighbor did not intend to inflict injury); *State Farm Fire & Cas. Co. v. Henderson*, 2002 WL 1354719, at *3 (S.D. Ind. 2002) (finding that the insured's "volitional acts of pointing the weapon at [the decedent] and pulling the trigger are not accidents and, therefore, are not covered under the policy.").  Moreover, according to *Herman*, intentional "'refers [ ] to the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs.'"  551 N.E.2d at 845 (citation omitted).

Here, George heard Mr. Samson and Ms. Ecker arguing prior to the incident.  He then testified that Ms. Ecker entered L.O.E.'s room and made a phone call saying Mr. Samson was going to shoot her.  George then observed his son, Mr. Samson, break down the door to L.O.E.'s room and heard several gunshots.  Sgt. Fitzgerald testified that Mr. Samson fired nine gunshots, and it was later confirmed that three of them struck Ms. Ecker, killing her.  Sgt. Fitzgerald further stated that when he investigates an accidental shooting, it usually involves one bullet being fired.

After shooting Ms. Ecker, George then observed Mr. Samson walk out of the room with the gun in his hand and make his way to the basement. Based on the circumstances of the case, the Court concludes that it is undisputed that Mr. Samson intended to shoot Ms. Ecker, even if he arguably did not intend to kill her or felt complete remorse for his actions. Moreover, because L.O.E.'s claim for emotional distress derives from Mr. Samson's act, coverage for L.O.E.'s claims is also barred. Thus, as a matter of law, the Court finds that Exclusions 6 and 8 exclude coverage for the claims brought by the Estate of Ms. Ecker and L.O.E. against the Estate of Mr. Samson.

### 3. *Exclusion 18*

Trustgard claims that Exclusion 18 excludes coverage for bodily injury or property damage because Mr. Samson committed a criminal act. [Filing No. 54 at 14.] Trustgard argues that Exclusion 18 bars coverage for claims brought by the Estate of Ms. Ecker and L.O.E. because it excludes recovery for "bodily injury or property damage arising from a criminal act or omission which is committed by, or at the direction of an insured person," regardless of "whether the person is actually charged with, or convicted of a crime." [Filing No. 54 at 14.] It claims that "[Mr.] Samson shot and killed Ms. Ecker at close range," which constitutes murder, voluntary manslaughter, or reckless homicide. [Filing No. 54 at 15.]

In response, the Estate of Ms. Ecker again argues that the "testimonial record and Dr. Joseph's interpretation of the same shows that [Mr.] Samson was insane in the criminal context as well as the insurance context." [Filing No. 60 at 11-12.] L.O.E. responds that although Indiana has not addressed the issue of whether the insanity defense also applies to exclusions for criminal acts, he claims that it applies to cooperation clauses. [Filing No. 63 at 9.] L.O.E. further argues that assuming the criminal standard of insanity applies in the context of insurance policies, a

genuine issue exists as to whether Mr. Samson was temporarily insane at the time of Ms. Ecker's shooting.  [Filing No. 63 at 9-10.]

Trustgard replies, as before, that it has demonstrated that Dr. Joseph's affidavit is insufficient to show that Mr. Samson was insane.  [Filing No. 12.]  It states that a "conviction for voluntary manslaughter (heat of passion killing) requires the state to prove knowing or intentional killing," and that the "[i]ntent to kill under the statute . . . can be proved by an inference drawn from the circumstances surrounding the act."  [Filing No. 75 at 11.]   It further claims that no other evidence disputes that Mr. Samson intentionally shot Ms. Ecker which excludes coverage pursuant Exclusion 18.  [Filing No. 75 at 12.]

As noted, Exclusion 18 precludes recovery for bodily injury or property damage that arises from a criminal act committed by the insured person.  [Filing No. 7-1 at 57.]  As Trustgard points out, if Mr. Samson would not have killed himself, he could have been charged with a number of crimes, ranging from murder to voluntary manslaughter to criminal recklessness.[5]  Defendants' sole rejoinder is reliance on a temporary insanity defense based on Dr. Joseph's affidavit.  As noted, the Court has found Dr. Joseph's affidavit attesting to Mr. Samson's alleged insanity inadmissible.  Additionally, "[s]imply because an act is committed in the heat of passion . . . does not render it unintentional.  Indiana requires the state to prove a knowing or intentional killing . . . . Intent to kill under this statute . . . can be proved by an inference drawn from the circumstances surrounding the act."  *Miles*, 730 F. Supp. at 1472 (citing *Rowan v. Owens*, 752 F.2d 1186 (7th Cir. 1984)).  Thus, even if Mr. Samson committed the act out of anger without intending to kill

---

[5] In Indiana, a person commits murder when he or she "knowingly or intentionally kills another human being . . . ."  Ind. Code § 35-42-1-1.  A person commits voluntary manslaughter when he or she "knowingly or intentionally . . . kills another human being . . . while acting under sudden heat . . . ."  Ind. Code 35-42-1-3.  Lastly, "[a] person who recklessly kills another human being commits reckless homicide . . . ."  Ind. Code § 35-42-1-5.

Ms. Ecker and immediately felt remorse for killing her, the circumstances surrounding the incident as described by his father and Sgt. Fitzgerald indicate that Mr. Samson knowingly and intentionally pointed the gun and fired nine shots at Ms. Ecker which constitutes a crime under several Indiana statutes. Defendants have provided no other evidence to contradict this conclusion. Accordingly, the Court finds that Exclusion 18 also excludes coverage for the claims brought by the Estate of Ms. Ecker and L.O.E. against the Estate of Mr. Samson.

### C. Remaining Claim

In the Amended Complaint, Trustgard seeks a declaration that it "has no duty to defend [t]he Estate of [Mr.] Samson and the lawsuits filed by [t]he Estate of [Ms.] Ecker and L.O.E. and Trustgard is entitled to recover defense costs and fees from the Estate of [Mr.] Samson . . . ." [Filing No. 7 at 8.] Trustgard does not brief these claims in its motion for summary judgment. It solely focuses on the fact that its policy precludes coverage for the claims from the Estate of Ms. Ecker and L.O.E. against the Estate of Mr. Samson.[6] Therefore, the issues of whether Trustgard has a duty to defend the Estate of Mr. Samson from the claims brought by the Estate of Ms. Ecker and L.O.E., and whether it can recover costs and fees from the Estate of Mr. Samson remain.

### V.
#### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Trustgard's Motion for Summary Judgment, [Filing No. 53], to the extent that its policy precludes coverage for claims brought by the Estate of Ms. Ecker and L.O.E. against the Estate of Mr. Samson. The Court asks the presiding

---

[6] In the Amended Complaint, Trustgard also seeks a declaration that it "has no duty to indemnify [t]he Estate of [Mr.] Samson for any liability it may have for bodily injury or death or punitive damages arising from the October 5, 2014 incident . . . ." [Filing No. 7 at 8.] Although Trustgard does not brief this claim in its motion for summary judgment, the fact that the Court finds that the policy precludes coverage for claims brought by the Estate of Ms. Ecker and L.O.E. against the Estate of Mr. Samson indicates that Trustgard has no duty to indemnify the Estate of Mr. Samson.

Magistrate Judge to confer with the parties to discuss a resolution of the remaining claim or establish a timeline for trial.

Date: 2/24/2017

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Mark Douglas Hassler
HUNT HASSLER & LORENZ, LLP
hassler@huntlawfirm.net

Jacob H. Miller
HUNT HASSLER LORENZ KONDRAS LLP
jmiller@huntlawfirm.net

Tricia Rose Tanoos
MODESITT LAW FIRM, P.C.
ttanoos@modesittlawfirm.com

Charles Schroeder Smith
SCHULTZ & POGUE LLP
csmith@schultzpoguelaw.com

Thomas R. Schultz
SCHULTZ & POGUE LLP
tschultz@schultzpoguelaw.com

William W. Drummy
WILKINSON GOELLER MODESITT WILKINSON & DRUMMY
wwdrummy@wilkinsonlaw.com